# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

NORMAN RUDISILL, et al.,      )      CASE NO. 1:08CV2409
                    )
        PLAINTIFFS,    )      JUDGE SARA LIOI[1]
                    )
vs.                 )
                    )      **MEMORANDUM OPINION**
FORD MOTOR COMPANY,    )
                    )
                    )
        DEFENDANT.    )
                    )

Before the Court is the motion for summary judgment filed by defendant Ford Motor Company[2] (Doc. No. 30), plaintiffs' brief in opposition (Doc. No. 31, as supplemented by Doc. No. 48), and defendant's reply (Doc. No. 33, as supplemented by Doc. No. 50). Plaintiffs also filed four notices of supplemental authority (Doc. No. 36,[3] Doc. No. 55,[4] Doc. No. 58, and Doc. No. 61) and defendant filed one notice of supplement authority (Doc. No. 51[5]). For the reasons discussed below, defendant's motion for summary judgment is **GRANTED**.

---

[1] This case was assigned to the docket of the undersigned on January 19, 2011 when Judge Kathleen O'Malley, the originally assigned judge was elevated to the Federal Circuit. At the time, the summary judgment motion was fully briefed.

[2] The Complaint names one John Doe defendant that has never been identified or served. Therefore, the Court treats the complaint as against only one defendant.

[3] Defendant opposed this submission by plaintiffs (Doc. No. 38), arguing (1) that it is not new authority and should have been submitted with plaintiffs' original memorandum in opposition, and (2) that the case is distinguishable.

[4] Defendant filed a response to plaintiffs' submission. (Doc. No. 57.)

[5] Plaintiff filed a response to defendant's submission. (Doc. No. 52.)

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Norman Rudisill and his wife, Karen Rudisill, filed a complaint in the Cuyahoga County Court of Common Pleas against Ford Motor Company ("Ford"). Ford timely removed the action to this Court on the basis of diversity jurisdiction. The complaint alleges a claim of employer intentional tort in violation of Ohio Rev. Code § 2745.01 and/or common law on behalf of Norman Rudisill ("Mr. Rudisill") and a derivative claim of loss of consortium on behalf of Karen Rudisill ("Mrs. Rudisill")[6] based on the following facts.

On February 2, 2007, Mr. Rudisill was injured during an accident while working on Mold Line 2 at Ford's Cleveland Casting Plant ("the Plant") in Brook Park, Ohio. (N. Rudisill Dep. at 41.) He had been employed by Ford since 1994 and, at the time of the accident, held the position of Team Leader. (*Id*. at 17.) He had worked on Mold Line 2 for about six years. (*Id*. at 21, 27-28, 29.) Mr. Rudisill's supervisor was the foreman, Kevin Wrobleski. (N. Rudisill Dep. at 40.)

Mold Line 2 is one of three mold lines at the Plant where Ford engine blocks are cast in molten steel. The mold line process employs a system of hooks, pulleys and rails suspended over an open pit. Along the rail system runs a chain of flat iron carts called "cartops." On top of each cartop sits a heavy iron crate-like fixture called a "drag flask." (N. Rudisill Aff. ¶¶ 3-5 and Exs. 2 and 3.)

The cartops and drag flasks cycle around the mold line together. At the beginning of the mold line, the drag flask is filled with compacted sand that is pressed in the shape of an engine block. This forms the bottom half of the mold for the engine block. (*Id*. ¶ 6.) An "engine

---

[6] The complaint also alleges a negligence claim against the unidentified and unserved John Doe defendant. That claim is **DISMISSED WITHOUT PREJUDICE**.

core," which contains the internal components of the engine block, is placed onto the molded sand and is covered by a "cope flask." The cope flask is the top half of the mold for the engine block. Through an automated process, molten iron is poured into the mold (i.e. between the drag flask and cope flask). The molten iron surrounds the engine core and hardens into the engine block. (*Id.* ¶ 7.) Once the engine block is formed, it is removed at a section of the mold line called the "hooking station." A chain hooked to an overhead conveyor system is attached to the engine block and lifts it off the drag flask, carrying the engine block away from the mold line. (*Id.* ¶ 8.) The drag flask remains on the cartop and circles back to the beginning of the mold line to be used to make another engine block. (*Id.* at ¶ 9.)

Occasionally, iron runs out of the drag flask on to the cartop. This over-pour of molten steel is referred to as a "hot-head." (*Id.*) At one of the final stops along the mold line, an employee known as the "rake-off man" uses a long metal pole to remove hot-heads and sand from the top of the drag flask, scraping them into a conveyor system running in the subfloor five feet below the mold line. The conveyor system collects the semi-molten hot-heads and hot sand into a "shaker pan." The shaker pan system carries these materials to another part of the plant for disposal. (*Id.* ¶¶ 10, 11 and Exs. 4, 5.) This final process of separating the engine block from the drag flask, raking hot sand and semi-molten hot-heads off the drag flask into the shaker pan system, preparing the drag flask for another round of molding, occurs at the "pick-off station." The pick-off station is where the rake-off man works. This is the location where Mr. Rudisill's accident occurred. (*Id.* ¶ 12.)

Sometimes, during the process of pouring the molten metal into the mold, some molten metal spills out (a "run-out") and cools onto the rim of the drag flask before it reaches the rake-off station. These run-outs must be removed from the drag flask before it can be used again

for another engine mold. To make this repair, the mold line is shut down and the drag flask is pulled off the line by an overhead crane and hoist. (N. Rudisill Dep. at 78-79; O'Neill Dep. at 14-15.) Mr. Rudisill testified that this is a routine process which he performed hundreds of times. (N. Rudisill Aff. ¶ 13.)

In order to remove the drag flask from the mold line, employees first have to remove two sections of removable wall ("guard rails")[7] from the outer edge of the mold line. (*Id.* ¶ 15 and Ex. 7; N. Rudisill Dep. at 84; Redella Dep. at 74.) This exposes the pit containing the sub-floor conveyor system and shaker pan with semi-molten materials being carried away for disposal. (N. Rudisill Aff. ¶ 15.) At the time of Mr. Rudisill's accident, the guard rails constituted the only barrier between the employees at the pick-off station and the open pit beneath the mold line.[8] This pit measures 28 inches by 68 inches with a depth of 59 inches. (*Id.* ¶ 17.)

Once the guard rails are removed, a hoist is attached to the drag flask to lift it off the cartop. To do this, employees stand near the edge of the pit and secure the hoist clamps to the drag flask.[9] The clamp that is attached to the far side of the drag flask has to be slung over the drag flask and then pulled taut to catch on the lip of the drag flask. (*Id.* ¶ 18; N. Rudisill Dep. at 82.) Once the hoist is attached, the drag flask is moved to the Plant floor[10] where it is picked up

---

[7] A photograph of these guard rails is attached to defendant's motion for summary judgment as Exhibit G. One section of the wall is approximately eight feet long and the other is four feet. (N. Rudisill Aff. ¶ 16.)

[8] Since Mr. Rudisill's accident, the drag flask removal procedure has been modified. Now, employees slide metal grates under the guard rails to cover the pit before removing the guard rails. Several of the photographs attached to Mr. Rudisill's Affidavit show these metal grates. (*See, e.g.,* Doc. No. 31, Ex. A2, showing the 8-foot long guard rail removed and the 4-foot guard rail in place, along with the underlying metal grate.)

[9] A photograph of an employee affixing the hoist clamps to a drag flask is attached to Mr. Rudisill's Affidavit. (Doc. No. 31, Ex. A9.)

[10] Photographs of this movement are attached to Mr. Rudisill's Affidavit. (Doc. No. 31, Exs. A10 and A11.)

4

by a forklift and taken to a different area for repair. (Marion Dep. at 54-55, 56-58.) The guard rails are then replaced and production resumes.

At the beginning of his shift on February 2, 2007, the day of the accident, Mr. Rudisill was informed that a drag flask needed to be removed from the mold line. A drag flask repairman, Willie Daniel, and another employee, Scott O'Neill, assisted with the process described above. (N. Rudisill Dep. at 84; O'Neill Dep. at 25.) Mr. Rudisill has very limited recall of the accident (N. Rudisill Dep. at 71-72), but O'Neill testified that they had just moved the drag flask over the pit and had it suspended above the floor. As they began to dislodge some of the sand,[11] the drag flask became unlevel and suddenly one of the clamps from the hoist slid off the drag flask and struck Mr. Rudisill in the face, knocking him backwards and into the open pit. The drag flask dropped to the floor. Mr. Rudisill landed on the shaker pan, which contained hot-heads. He was unconscious and was being burned by the material in the shaker pan. (O'Neill Dep. at 30-39.)

Hearing on his 2-way radio that there was a man down, another worker, Ernest McClanahan, went to help. He observed the trouble that Mr. Rudisill was in, grabbed a pair of gloves and jumped down in to the hole. He moved the hot-heads away from Mr. Rudisill's body and rolled him over, observing that he was still unconscious, bleeding from his head and burned over parts of his body. An EMT arrived on the scene and jumped into the hole. Mr. Rudisill began to regain consciousness and cried out in pain. The men finally managed to get him out of the hole. (McClanahan Aff., Doc. No. 31, Ex. J.)

---

[11] O'Neill recalls that Daniel was hitting the drag flask with either a pick or a sledgehammer, both of which were used as a regular practice. (O'Neill Dep. at 33-34; *see also* Rudisill Aff. ¶ 22 and Ex. A11.)

Mr. Rudisill was burned on both arms and legs, his stomach and his left hand. He had a left-side head injury that required several staples to close. He now experiences dizzy spells and ringing in his ears. He also has memory problems. He has had numerous surgeries related to his burns and to correct displaced disks in his neck, and has undergone both physical and occupational therapy. (N. Rudisill Dep. at 103-11.)

In his complaint, Mr. Rudisill alleges that Ford "knew that removing the guard/rail [sic] required its employees to work dangerously close to the uncovered floor opening, thereby creating a dangerous condition and/or process." (Compl. ¶ 21.) He further alleges that Ford "knew that the hooks [he] was required to use when removing the drag flask from the line were not the proper size and that a hazardous condition existed in attaching the hooks to both ends of the flask in preparation to remove it from the line." (Compl. ¶ 24.) Finally, he alleges that Ford knew such conditions "were dangerous and substantially certain to cause severe injuries to Mr. Rudisill[ ]" and that "harm would be certain or substantially certain to occur." (Compl. ¶ 26.)

## II. DISCUSSION

### A.      Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides in relevant part as follows:

> **(a)      Motion for Summary Judgment or Partial Summary Judgment.** A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

A movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *White v. Turfway Park Racing Ass'n.*, 909 F.2d 941, 943-44 (6th Cir. 1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict[.]" *Id*. at 252.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. Moreover, "[t]he trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989), *citing Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact. *Fulson v. Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome

7

summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id*.

**B.      Analysis**

In Ohio, employees injured in the course of their employment are usually limited to whatever remedies are available through the Workers' Compensation Act. *See* Ohio Const. II § 35; Ohio Rev. Code § 4123.74. Under the Act, employers are generally "not … liable to respond in damages at common law or by statute for any injury … received … by any employee in the course of or arising out of his employment … whether or not such injury … is compensable under [the Act]." Ohio Rev. Code § 4123.74.

In 1991, the Ohio Supreme Court set out the test used to determine whether an employer has committed a common law intentional tort. *See Fyffe v. Jeno's, Inc.*, 59 Ohio St.3d 115 (1991).[12] The Ohio legislature then passed § 2745.01, effective October 20, 1993, aimed at revising the elements of and standards for an employer intentional tort. That statute was found to be unconstitutional. *See Johnson v. B.P. Chemicals, Inc.*, 85 Ohio St.3d 298 (1999). The legislature then passed a revised form of § 2745.01, effective April 4, 2005. The constitutionality of that revised statute has recently withstood challenge. *See Kaminski v. Metal & Wire Prods.*

---

[12] In *Fyffe*, the court held that,

> in order to establish "intent" for the purpose of proving the existence of an intentional tort committed by an employer against his employee, the following must be demonstrated: (1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task.

59 Ohio St.3d at 115, Syllabus ¶ 1.

*Co.*, 125 Ohio St.3d 250 (2010); *Stetter v. R.J. Corman Derailment Servs., L.L.C.*, 125 Ohio St.3d 280 (2010).[13]

Under Ohio Rev. Code § 2745.01, an employee may sue for an injury resulting from the intentional tort of his employer. The statute provides:

(A)     In an action brought against an employer by an employee, or by the dependent survivors of a deceased employee, for damages resulting from an intentional tort committed by the employer during the course of employment, the employer shall not be liable unless the plaintiff proves that the employer committed the tortious act with the intent to injure another or with the belief that the injury was substantially certain to occur.

(B)     As used in this section, "substantially certain" means that an employer acts with deliberate intent to cause an employee to suffer an injury, a disease, a condition, or death.

(C)     Deliberate removal by an employer of an equipment safety guard or deliberate misrepresentation of a toxic or hazardous substance creates a rebuttable presumption that the removal or misrepresentation was committed with intent to injure another if an injury or an occupational disease or condition occurs as a direct result.

(D)     This section does not apply to claims arising during the course of employment involving discrimination, civil rights, retaliation, harassment in violation of Chapter 4112. of the Revised Code, intentional infliction of emotional distress not compensable under Chapters 4121. and 4123. of the Revised Code, contract, promissory estoppel, or defamation.

The Ohio legislature's intent in enacting § 2745.01, "as expressed particularly in 2745.01(B), is to permit recovery for employer intentional torts only when an employer acts with specific intent to cause an injury, subject to subsections (C) and (D)." *Kaminski*, 125 Ohio St.3d at 263 (citing *Talik v. Fed. Marine Terminals, Inc.*, 117 Ohio St.3d 496 (2008) for the proposition that the statute "modified the common-law definition of an employer intentional tort"

---

[13] The Court stayed the instant case on September 16, 2009, at the plaintiffs' request, to await a determination in the *Kaminski* case. Then, on December 15, 2009, the case was stayed and closed, subject to reopening upon written motion of plaintiffs after a decision in *Kaminski*. (*See* Doc. No. 22.) The Court allowed the parties, at their request, to work informally to conclude fact discovery during the stay. On March 26, 2010, three days after *Kaminski* and *Stetter* were decided, plaintiffs moved to reopen the case. Thereafter, Ford filed its motion for summary judgment.

by rejecting "the notion that acting with a belief that injury is substantially certain to occur is analogous to wanton misconduct"); *see also Stetter*, *supra*, Syllabus ¶ 3 (the statute "does not eliminate the common-law cause of action for an employer intentional tort" even though it "significantly limits" such lawsuits).

The burden, of course, is on the plaintiffs to prove the elements of an employer intentional tort. Plaintiffs allege that Ford knew it created a dangerous condition by requiring employees to remove the guard rails as part of the process of removing a drag flask for repair (Compl. ¶ 21) and knew that the clamps Mr. Rudisill was required to use were not the proper size (*id.* ¶ 24).[14]

With respect to removal of the guard rails, plaintiffs avail themselves of the rebuttable presumption provided for in subsection (C). There is no dispute that part of the process of removing a drag flask for repair was to first remove the guard rails protecting employees from the open pit containing the sub-floor conveyor system and the shaker pan with hot, molten materials. There also seems to be no dispute that, had the guard rail been in place, Mr. Rudisill could not have fallen into the pit when he was knocked unconscious by the clamp that unexpectedly came loose. Plaintiffs, therefore, argue that this "[d]eliberate removal by [Ford] of an equipment safety guard … creates a rebuttable presumption that the removal … was committed with intent to injure …." Ohio Rev. Code § 2745.01(C).[15]

---

[14] Plaintiffs also allege that Ford knew that, to align the clamps on the drag flask, Mr. Rudisill was required to reach over the floor opening, exposing himself to molten iron (Compl. ¶ 22) and that operation of the overhead crane to hoist the drag flask off the mold line required Mr. Rudisill to work in close proximity to the floor opening (*id.* ¶ 23). These arguments cannot withstand scrutiny. Mr. Rudisill was not injured by leaning over the floor opening or by the mere close proximity to either the floor opening or the molten iron. Had the clamp not come undone and struck him, he would not have been knocked backward and unconscious and, had the guard rails not been removed, he could not have fallen into the open pit.

[15] There is no dispute that the guard rails were an "equipment safety guard" within the meaning of the statute.

Although in a footnote Ford argues that the presumption does not apply in this case because the guard rail was removed to perform maintenance, Ford also contends that, even if it does apply, the presumption is sufficiently rebutted by the evidence. (*See* Doc. No. 30 at 13, n. 5.)

Affidavits submitted by Christina Redella (Senior Safety Engineer at the Plant), Daniel Marion (Manufacturing Planning Specialist at the Plant), Scott O'Neill (co-worker and eye witness to the accident) and Kevin Wrobleski (Maintenance and Production Supervisor at the Plant), all attest that workers' safety is important to Ford and that Ford does not deliberately intend to injure its employees. (Doc. No. 30, Exs. L, N, O, P.)

More importantly, Ford also submits evidence that it had no reason to believe that the process used for removing drag flasks for repair was actually dangerous to its employees. First, Christina Redella attests that "Ford promotes safety in the workplace[,]" and that "[p]rior to Norman Rudisill's accident in February 2007, there were no reported incidents or accidents in which any employees were injured from clamps slipping off of flasks or from falling onto the shaker pan when removing flasks for repair." (Redella Aff. ¶¶ 4, 5.)[16] This is significant in light of the affidavit of Mark Tomkovich, the Controller at the Plant, who attests that Ford's electronic and physical records for the Plant reveal that "[s]ince the Cleveland Casting Plant opened in 1952, hundreds of millions of man-hours have been worked at the plant." (Tomkovich Aff. ¶ 4.)

---

[16] Without any record citation, plaintiffs declare in their opposition brief that "other employees had previously suffered injuries resulting from unguarded floor openings." (Doc. No. 31 at 12.) They also cite to deposition testimony of Marion, Redella and Jason Kriebel (a Ford Safety Engineer) where these three supposedly admitted that floor openings are "obvious" hazards that create an "unsafe" condition. (Marion Dep. at 50; Redella Dep. at 54, 115; Kriebel Dep. at 8, 93.) However, the Court's reading of the deposition pages cited (to the extent they are provided, and some are not) does not support these conclusions. Plaintiffs also point to deposition testimony of Wrobleski, the foreman, who states that moments before the accident he saw the drag flask "sitting on an angle" and he said: "Put it down and get a high/low [forklift] [.]" (Wrobleski Dep. at 131.) He then "kept going, because [he] had to go into the office because [he] was taking care of another line." (*Id.*) This is certainly not evidence that Ford had prior knowledge of a dangerous work situation and failed to act on that knowledge. Even if it were such evidence, it would have to be classified as a "scintilla" and insufficient to create a material factual dispute.

More specifically, "[f]rom 1994 through 2006, there were a total of 72,995,687 total man-hours worked at the Cleveland Casting Plant, including 65,100,328 man-hours for hourly employees …." (*Id.* ¶ 5.) Further, since the Plant opened in 1952, "at least 16,640,925 net tons of iron have been produced and shipped in various forms through the plants [sic] casting processes prior to 2007." (*Id.* ¶ 7.) In other words, despite all of those man-hours working with tons of iron, there have been no reports of incidents or injuries like Mr. Rudisill's.

"Prior accidents are probative of whether an employer knows that an injury is substantially certain to occur." *Taulbee v. Adience, Inc., BMI Div.*, 120 Ohio App.3d 11, 20 (Ohio Ct. App. 1997). In this case, the evidence establishes that Ford had no reason to believe that the process it had in place to remove drag flasks for repair was dangerous and, therefore, Ford could not have intended to injure Mr. Rudisill.

Indeed, other evidence in the record supports the conclusion that Ford had no reason to believe the process it had in place was dangerous or was substantially certain to injure an employee. Neither Mr. Rudisill nor his co-workers had ever seen an accident such as his. Mr. Rudisill testified as follows:

> Q:   Prior to the day of your accident, have you ever had any problems with the clamps coming off at the flask or a car top while removing it from the line?
>
> A:   Never.
>
> Q:   So as far as you were concerned, the process of hooking the clamps up and the way you described it worked?
>
> A:   Yes, I've seen it for the past six years.
>
> * * *
>
> Q:   Prior to your accident, had you ever known of anyone who fell into the hole and onto the shaker pan?
>
> A:   No.

(N. Rudisill Dep. at 83, 100.) Moreover, O'Neill testified:

Q:      Have you even seen clamps slide off a drag flask before?

A:      Never.

Q:      Was that a danger that you were particularly concerned about?

A:      No.

(O'Neill Dep. at 72.)

Mr. Rudisill, as the Team Leader, would have reported to Ford Management had he believed the drag flask removal process was unsafe and he would not have allowed employees to perform the task if he thought it was dangerous:

Q:      You were expected to report [something dangerous]?

A:      Yes.

Q:      [I]f you saw something dangerous, you would do so, you would report it?

A:      Yes.

* * *

Q:      Have you ever required another employee to perform a task that you thought was dangerous?

* * *

A:      No.

Q:      And would you do that?

A:      Make someone else do it?

Q:      Right.

A:      No.

(N. Rudisill Dep. at 64, 67-68.) Yet, neither Mr. Rudisill nor any other employee ever reported a dangerous condition or voiced a concern to Ford about the duties at the rake-off station or about the process of removing drag flasks for repairs:

Q:      Had anyone ever complained to you about [working around the opening]?

A:      No.

Q:      Did you ever complain to anybody about it?

13

A:    No.

* * *

Q:    [H]ad you complained about the possibility of clamps coming off drag flasks before?

A:    No.

Q:    And why hadn't you complained about them before?

A:    Never happened.

Q:    Same question with regard to the opening that you spent a lot of time discussing here today, did you ever complain about the opening in the floor during the flask removal process?

A:    No.

Q:    Why didn't you complain?

A:    I never saw a problem with it, to be honest.

(O'Neill Dep. at 57, 72-73.)[17]

---

[17] In fact, Mr. Rudisill himself does not contend that anyone at Ford wanted to hurt him:

Q:    So if you saw anything that you thought was dangerous in the past, who would you talk to? The supervisor or the foreman?

A:    Foreman.

Q:    And your foreman was Kevin Wrobleski in your last job?

A:    Right.

Q:    And Kevin was responsive?

A:    Yes.

Q:    Is it fair to say that Kevin didn't want you or anyone else to get hurt?

* * *

A:    I would hope that he didn't want somebody to get hurt?

Q:    Do you have any reason to think that Kevin wanted anybody to get hurt?

A:    No.

(N. Rudisill Dep. at 68-69.) Admittedly, plaintiffs argue that Mr. Rudisill's expressed belief cannot be used against him, citing *Baker v. V.I.P. Contractors*, No. CA90-08-178, 1991 WL 81870 (Ohio Ct. App. May 13, 1991). However, *Baker* is clearly distinguishable from the instant case. There, a crew was laying a sanitary sewer pipe. The procedure required the backhoe operator to install a trench box after he dug the ditch. The trench box was a safety device with two purposes: (1) it kept the walls of the ditch from caving in on workers, and (2) since the backhoe's bucket would not fit inside the trench box, it permitted the backhoe operator to dig without striking anyone working in the ditch. That day, after digging the ditch, the backhoe operator removed the trench box because it would not fit in the ditch. Baker's foreman directed him to get in the ditch and lay the sewer pipe. Baker objected, but his supervisor laughed at him and implied that if he did not want to do it, there were plenty of others who would. Baker then went into the ditch. While working there, the backhoe struck him in the neck and head. Baker sued and the trial

All this undisputed evidence rebuts the presumption that Ford intended to injure an employee by the process of removing a drag flask for repair, which process required the temporary removal of guard rails and exposure of the floor opening containing molten metal,[18] the hoisting of the drag flask by means of clamps attached by the employees,[19] and the movement of the drag flask to the floor, all while the employees worked near the floor opening.

court granted summary judgment in favor of the employer concluding that it had rebutted the presumption that removal of the trench box constituted an intent to injure Baker. On appeal, the court commented that the trial court relied too heavily on Baker's own statement that the backhoe operator would "have to be crazy to do it [strike him with the backhoe] on purpose …[,]" 1991 WL 81870 at *2 (alterations in original), in the face of the evidence that the supervisor forced him to work in the dangerous situation after he objected to doing so. The court of appeals stated that "reasonable minds could differ as to whether [the employer] rebutted the presumption of an intent to injure Baker." *Id.* In the instant case, there is no evidence that anyone thought the process was dangerous, or that anyone (including Rudisill) had ever objected to working under the conditions created when the guard rails were removed. Ford's own safety records are put forth as proof that there had never been a similar accident, which would have alerted Ford to the need for additional safety procedures, such as the use of metal grates, which was instituted immediately after Mr. Rudisill's accident.

[18] Ford cites *Shanklin v. McDonald's USA, LLC*, No. 2008 CA 00074, 2009 WL 154034 (Ohio Ct. App. Jan. 20, 2009) as authority for the fact that the guard rails were temporarily removed, not with an intent to injure, but with the intent to repair. In *Shanklin*, a microwave oven needed to be repaired. The repairman removed the stainless steel housing unit, exposing the electrical components of the microwave. He replaced a fuse and, without replacing the housing unit, he filled a container with water and placed it in the oven. He turned it on to see if the water would heat. Prior to doing so, he announced to the workers in the busy food preparation area that he was powering up the microwave. At the same time, Shanklin was making sandwiches in the food preparation area and needed to use the tartar sauce gun located on a shelf near the maintenance workers. As she returned the tartar sauce gun to the shelf, she made contact with the corner of the microwave oven and was shocked by an exposed electrical wire. She was knocked unconscious and suffered second-degree burns, with entrance and exit wounds to her back and torso. She was hospitalized for three days in a burn unit. Because *Kaminski* and *Stetter* had yet to be decided, the court analyzed the employer intentional tort claim under both *Fyffe* and the current § 2745.01 and found the presumption in subsection (C) to be rebutted because (1) the housing unit had to be removed to make the repair; (2) the accident occurred during the time of the repair; and (3) during the repairs the employer did not require its employees to continue to use the microwave oven. Plaintiff argues that *Shanklin* does not apply because Ford required the removal of the guard rail and then, while the removal was being performed, needlessly allowed the workers to remain near the open pit (when it could just have easily have required the guard rails to be restored or the pit to be otherwise covered while the removal for repair was being completed) and also kept the pit energized and the shaker pan operational (when it could have shut both down). The Court agrees that application of *Shanklin* to the facts herein would provide further support that the presumption is rebutted.

[19] Plaintiffs also claim in their complaint that the clamps "provided by Ford for use in this task were the wrong size and should not have been used for removing drag flasks from the line." (Compl. ¶ 15.) In Mr. Rudisill's affidavit attached to plaintiffs' brief in opposition to the motion for summary judgment, Mr. Rudisill asserts that there were two sizes of clamps, neither of which were labeled, and that he "was trained to use the wrong set of clamps." (N. Rudisill Aff. ¶ 20.) There is no mention in the complaint of two sizes of clamps. With respect to training, there is only an allegation that "Ford did not provide any formal or specialized training for Mr. Rudisill on how to remove excess steel from a 'run-out'." (Compl. ¶11.) In any event, plaintiffs have provided no evidence as to which of the two sizes of clamps was used on the day of the accident; nor have they provided evidence that the clamp slipped off because it was the wrong size. Even if the clamps were the wrong size, such use would be, at most, the result of

15

Once the presumption of intent to injure is, as here, rebutted by Ford, the presumption has no further evidentiary purpose. *See* Ohio Evid.R. 301 ("a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof …, which remains throughout … upon the party on whom it was originally cast"); *accord* Fed. R. Evid. 301. Plaintiffs are unable to meet their burden of proof that requiring Mr. Rudisill to engage in this process (which resulted in injury) amounted to an employer intentional tort.

Plaintiffs also assert that Ford failed to issue Mr. Rudisill appropriate personal protective equipment. (Compl. ¶ 17.) In their brief in opposition, they assert that this failure was "deliberate," i.e., intentional. (Doc. No. 31 at 24.) Plaintiffs point to Ohio Admin. Code § 4123:1-5-17, which requires that personal protective equipment be made available to workers in certain circumstances and that such equipment must provide effective protection against hazards.[20]

---

negligence and that is not actionable as an intentional tort. In addition, and importantly, the clamps cannot be said to be an "equipment safety guard" which was somehow removed by Ford. Therefore, the rebuttable presumption of intent to injure does not apply with respect to any claim relating to the clamps and plaintiffs have not otherwise proven an intentional tort with respect to these clamps.

[20] Ohio Admin. Code § 4123:1-5-17 provides, in relevant part:

    (G)      Head and hair protection.
          (1) Responsibility.
          (a) Employer.
          (i)      Whenever employees are required to be present where the potential hazards to their head exists from falling or flying objects, or from physical contact with rigid objects … employers shall provide employees with suitable protective headgear.
    ***
    (I)  Protection of the body and exposed parts and other protective equipment.
    ***
          (3)  Welding, cutting, brazing, and molten metal exposures.  All employees exposed to the hazards created by[…] molten metal operations shall be protected by protective clothing. This includes:
          (a)      Flameproof gauntlet gloves.
          (b)      Flameproof aprons made of leather, or other material which provides equivalent protection.

Defendant does not directly address the argument about the protective equipment. It merely states in a footnote that "there is no evidence that the clamp would not have slipped off or that Plaintiff would not have fallen onto the shaker pan had Plaintiff worn different clothing[.]" (Doc. No 33 at 9, note 10.) Defendant then asserts that "even if established, such evidence would not establish an employer intentional tort claim under *Fyffe*, much less under the stricter specific intent requirement in the Statute." (*Id.*).

While Defendant is correct that protective clothing would likely not have prevented Mr. Rudisill from falling into the open pit, it might well have minimized the injuries he sustained. That said, however, the Court concludes, as a matter of law, that plaintiffs' argument regarding any failure to provide appropriate protective equipment or clothing is to no avail because failure to *provide* personal protective gear does not qualify, within the meaning of the statute, as *removal* of an "equipment safety guard" so as to invoke the rebuttable presumption of intent to injure.[21] The Court also concludes that where, as here, there is simply no evidence of a history of injury resulting from lack of protective gear in circumstances similar to those in this case, any failure to supply protective clothing amounts to no more than negligence, which is

---

(c)     Exterior clothing made of wool, cotton, or other material chemically treated to reduce combustibility.

(d)     Capes or shoulder covers made of leather or other material which provides equivalent protection

***

(10)    Barriers and warning devices.  The employer shall provide barriers … for the protection of employees when work is performed in congested areas[.] * * *

[21] In their response to defendants' notice of supplemental authority (Doc. No. 51), plaintiffs supply the transcript of a case in Cuyahoga County Court of Common Pleas where the trial judge denied a motion for directed verdict, concluding that it was a matter for the jury to decide whether a supervisor's telling an apprentice that he did not need to use the rubber gloves and sleeves provided by the employer constituted the deliberate removal of an equipment safety guard within the meaning of the statute in order to allow the plaintiff a rebuttable presumption of intent to injure. *See* Doc. No. 52, Ex. B, *Hewitt v. L.E. Myers Co.*, No. CV711717 (Ohio Ct. C. Pl. Sept. 23, 2010). Plaintiffs do not cite this case in specific support of their claim that Ford failed to supply Mr. Rudisill with protective clothing. However, even if they had, the Court would find *Hewitt* distinguishable because, according to the transcript in *Hewitt*, the employer did supply protective gear but the supervisor told the employee that he need not use it. Arguably, as the state court judge concluded, this might constitute removal of an equipment safety guard.

insufficient to establish an intentional tort. *See Youngbird v. Whirlpool Corp.*, 99 Ohio App.3d 740, 746 (Ohio Ct. App. 1994).

Finally, in their supplemental brief in opposition to defendant's motion for summary judgment, plaintiffs report a laundry list of substandard conditions found during various inspections conducted by the United States Department of Labor ("DOL") between May 12, 1998 and August 5, 2010. Plaintiffs allege that these citations, characterized as "serious" by the DOL, "placed Ford on notice that its Brook Park Casting's [sic] plant was not OSHA compliant as it relates to fall hazards such as the one that injured Rudisill" (Doc. No. 48 at 4)[22] and are evidence that the Plant "is in a chronic state of non-compliance with OSHA and, as described, this condition demonstrates that Rudisill's injury (which occurred as a direct result of conditions which prompted OSHA violations) was committed with the requisite intent to injure." (*Id*. at 7.) Plaintiffs argue:

> Here, it has recently come to light that OSHA violations run rampant at Ford's Brook Park Castings plant for at least the last 12 years. Ford has produced no evidence that they have, proactively, sought to abate these conditions. And little, if any, evidence exists that Ford reactively, has resolved these conditions once

---

[22] Plaintiffs allege that employees at the Plant were injured 6,975 times between 1998 and February 2, 2007. (Doc. No. 48 at 5.) In support of that assertion, they submit the affidavit of their attorney, Scott J. Robinson. (Doc. No. 48, Ex. A.) He states that he reviewed Ford's OSHA injury logs, which are "too voluminous to attach," (*id.* ¶ 4), but are listed 15 to a page. Since there are 465 pages, he computes that there were 6,975 injuries. He also states that a sampling of 50 of Ford's Incident Investigations Reports completed between January 2000 and February 2, 2007, reveal that "[n]early all of these Incident Reports report [sic] concerned employees who were injured because of falls." (*Id.* ¶ 5.) Unfortunately, to support this assertion, he points to "Exhibit 2" attached to his affidavit. This exhibit is bates numbered, presumably to enable pinpoint citations. However, there are no such citations and this Court is not required to comb through the exhibit to ascertain whether "nearly all" of the reports involve falls. Furthermore, the issue is not just falls in general; the relevant falls would have to be similar factually to Mr. Rudisill's fall. To illustrate the possible absurdity of relying on this "evidence," the Court need only look to the very first page of Exhibit 2. This is a report of an injury caused by a fall when the "employee lost footing as she stepped into the door of the cafeteria." This is an ordinary "slip and fall" incident. There is nothing in the report to suggest that it was any fault of Ford's; in fact, the recommended corrective action listed in the report is to "maintain sure footing[;] also not to rush through the door area's [sic]." The second and third incident reports in Exhibit 2 are also slip and fall cases. These clearly have no relevance in this case. Absent pinpoint citations to this exhibit, the Court can only assume, based on these few examples, that the assertion that "nearly all" of these incidents involved falls is not reliable. More importantly, even if the reports concern "falls" generally, they do not distinguish the type of falls and, therefore, there is nothing to suggest that the falls were substantially similar to the fall involved in this case.

18

they have been brought to light, either by the [DOL] or through an employee's injury.

Again, even after Rudisill's catastrophic accident, after more than 6,975 other accidents of varying severity, after at least 31 related OSHA citations, and after $55,740.00 in fines and incident costs, as of February 2, 2009, Ford still chooses not to remedy the Serious OSHA violations in its Castings Plant. Employees are still injured by unguarded floor openings.

Evidence of Ford's chronic failure to protect employees from unguarded walking surfaces demonstrates Ford's intent to injure as it has been recognized by Ohio courts. At the very least, in the absence of any plausible explanation for these conditions, genuine issues of material facts remain so that summary judgment is inappropriate.

(Doc. No. 48 at 8.)

Ohio courts have generally rejected the use of OSHA citations to prove an employer's intent to harm. *See Duncan v. Mosser Const., Inc.*, No. L-04-1364, 2005 WL 1845265, at *4 (Ohio Ct. App.  July 8, 2005) (quoting *Hernandez v. Martin Chevrolet, Inc.*, 72 Ohio St.3d 302, 303 (1995): "Congress did not intend OSHA to affect the duties of employers owed to those injured during the course of their employment."); *see also*, *Juhn v. Ford Motor Co.*, No. 1:10cv348, at 7-8 (N.D. Ohio Jan. 7, 2011) (Boyko, J.).

In addition,

[t]he mere existence of a dangerous condition alone is not sufficient to satisfy the first prong [of the *Fyffe* test]. Nor is knowledge of the mere possibility of a dangerous condition sufficient. "The employee bears the burden of proving by a preponderance of the evidence that the employer had *actual knowledge* of the *exact dangers* which ultimately caused the injury."

*Chokan v. Ford Motor Co.*, No. 87082, 2006 WL 3055412, at *2 (Ohio Ct. App. Oct. 26, 2006) (quoting *Reed v. BFI Waste Systems*, No. CA95-06-062, 1995 WL 617482, at *2 (Ohio Ct. App. Oct. 23, 1995) (citing *Sanek v. Duracote Corp.*, 43 Ohio St. 3d 169, 172 (1989) (emphases added)).

Defendant correctly argues that, to be relevant, prior accidents must be substantially similar to the one at issue before they can be admitted into evidence. *Rye v. Black & Decker Mfg. Co.*, 889 F.2d 100, 102 (6th Cir. 1989). "Substantial similarity means that the accidents must have occurred under similar circumstances or share the same cause." *Id*. Plaintiffs have the burden of proving substantial similarity. *Id*.

In support of the relevance of its laundry list of citations, plaintiffs cite *Brookover v. Flexmag Indus., Inc.*, No. 00CA49, 2002 WL 1189156, at *24 (Ohio Ct. App. Apr. 29, 2002), where an employee was injured by an unguarded nip point on a machine. The trial court allowed evidence of seventy-seven (77) other unguarded nip points located throughout the employer's facility, which were discovered on machines other than the one that injured Brookover and which were discovered after Brookover's accident. The court of appeals found no error, stating: "[C]ircumstantial evidence often must be introduced to establish the employer's intent to injure an employee. A chronic failure to guard machinery may illustrate such intent." *Id*. (citing *Dirksing v. Blue Chip Architectural Prods., Inc.*, 100 Ohio App. 3d 213 (Ohio Ct. App. 1994) (considering evidence that an employer had a history of failing to provide adequate safety protections and concluding that, in light of the employers' failure, injury to an employee was only a matter of time.))

Defendant argues that the "other incidents" submitted by plaintiffs are not substantially similar to Mr. Rudisill's accident. Ford points to the very same case relied upon by plaintiffs, *i.e.*, *Brookover*, *supra*. In *Brookover*, the court of appeals affirmed a trial court's admission of evidence of prior accidents because they were not "so dissimilar" to Brookover's accident to conclude that it was an abuse of discretion to admit them. The court stated:

20

> We do not believe that in order to be admitted into evidence, an accident must have occurred in the exact place and the exact manner as the injury in question. When examining and comparing a prior injury, a court must balance all factors to determine whether the injuries, although not exactly the same, are substantially similar.

*Brookover*, *supra*, at *26. Defendant argues that, other than the single OSHA citation for Mr. Rudisill's own accident (Doc. No. 31, Ex. A4 at p. 2), not one of the citations or other incidents involved the shaker pan, guarding for the shaker pan, the rake-off station on Mold Line 2, the clamps used to remove the drag flasks, or the drag flask removal process.[23]

The Court concludes that the incidents and reports submitted by plaintiffs in their supplemental memorandum in opposition are not substantially similar to the accident in this case, are not evidence of deliberate intent to injure, and do not set up any material factual dispute rendering summary judgment inappropriate.

### III. CONCLUSION

Having considered the parties' arguments in their various filings, the Court concludes that there are no material factual disputes that would preclude summary judgment. Defendant Ford is entitled to summary judgment on plaintiffs' claim of employer intentional tort. Since Mrs. Rudisill's lack of consortium claim is derivative of the intentional tort claim, that claim must also fail. *Mawaldi v. St. Elizabeth Health Ctr.*, 381 F. Supp. 2d 675, 692 (N.D. Ohio 2005) ("[A] cause of action based upon a loss of consortium … is dependent upon the existence of a primary cause of action and can be maintained only so long as the primary action

---

[23] Defendant also correctly argues that twenty-seven (27) of the thirty-four (34) OSHA citations referenced by plaintiffs were issued because of inspections (not an accident or injury) that occurred nearly nine years before Mr. Rudisill's accident. (Doc. No. 48 at 1-4, Nos. 1-27 and Ex. A1.) Three others arise from one substantially different accident at an unrelated area of the Plant. (*Id*. at 5-6, Nos. 28-30 and Ex. A4.). The last three citations also involved inspections (not accidents or injuries) at different areas of the Plant which occurred after Mr. Rudisill's accident. (*Id*. at 6-7, Nos. 32-34 and Ex. A5.)

continues." (quoting *Messmore v. Monarch Machine Tool, Co.*, 11 Ohio App. 3d 67, 68-69

(Ohio Ct. App. 1983) (alteration in original)).

Accordingly, Doc. No. 30 is **GRANTED**.


**IT IS SO ORDERED**.


Dated: March 30, 2012

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**